**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERICAN FINANCIAL RESOURCES, INC.,<br><br>              Plaintiff,<br><br>v.<br><br>THE MONEY SOURCE, INC., et al.<br><br>              Defendant. | Civil Action No. 14-1651 (JLL)<br><br><br>**OPINION** |

**LINARES,** District Judge.

This matter comes before the Court by way of Plaintiff American Financial Resources, Inc. ("AFR")'s application for a preliminary injunction seeking, among other things, to preliminarily enjoin all Defendants from soliciting business from AFR's clients using confidential business information they allegedly misappropriated. The Court has considered the submissions made in support of and in opposition to AFR's application, as well as the arguments made on the record on April 14, 2014. For the reasons set forth below, Plaintiff's application is granted in part and denied in part. Specifically, Plaintiff's application is granted as to Defendants Jon Laolagi ("Laolagi") and Kurt Lehrman ("Lehrman"), and denied as to Defendants The Money Source, Inc. ("Money Source"), Endeavor America Loan Services ("Endeavor"), John Poche ("Poche"), Michael and Darius Mirshahzadeh, and Stavros Papastavrou ("Papastavrou").

## I.      BACKGROUND

### A.      General Background

1

AFR is a New Jersey corporation engaged in the business of originating, brokering, and servicing mortgage loans nationwide.  (Am. Compl. at ¶ 1; Dubnoff Cert. at ¶ 2.)

Defendants Lehrman, Laolagi and Poche (collectively, "AFR's former employees")[1] were employed at AFR as account executives.  (Am. Compl. at ¶¶ 25-27.)  AFR hired Laolagi in April 2008, Lehrman in December 2008, and Poche in August 2009.  (*Id.*)  Their duties included: (a) developing and maintaining business relationships with assigned and prospective accounts; (b) maintaining a high level of client service and availability; (c) acting as liaison between the wholesale client and loan operations; and (d) training approved clients on AFR products and proper submissions of loans.  (Dubnoff Cert. at ¶ 6.)  As a condition of their employment with AFR, AFR's former employees signed a Non-Competition/Solicitation, Confidentiality and IP Assignment Agreement (the "Agreement").  The relevant provisions of the Agreement are set forth below:

> **Non-competition After Termination**
> In the event that Employee's employment or other relationship with AFR should end for any reason, Employee agrees that Employee, for the eighteen (18) month period commencing with the cessation of employment or the relationship with AFR, shall not in any state in which AFR is licensed to conduct business at the time of Employee termination: (a) directly or indirectly, on Employee's behalf or on behalf of or in concert with any other person, firm, corporation association or other entity, engage in, or in any way be concerned with or negotiate for, or acquire or maintain any ownership interests in, any business or activity which is the same, similar to or competitive with any business or activity conducted by, engaged in or developed for later implementation by or on behalf of AFR . . . on the date hereof or at any time during the term of Employee's employment with AFR; and/or ( b ) directly or indirectly, solicit, sell to, divert, serve, accept, receive, or conduct any business or any type, or any business or activity conducted by, engaged in or developed for later implementation by or on behalf of AFR . . . With respect to AFR Confidential Information encompassed by this  provision, such  non-competition  period  shall continue for so long as such information remains confidential and shall extend to all geographic areas.

---

[1] Laolagi, Lehrman, and Poche are residents of California, Washington, and Texas, respectively.  (Am. Compl. at ¶¶ 2-4.)

**Confidential Information**
Confidential Information includes but is not limited to all proprietary and confidential information and trade secrets relating to AFR's clients, vendors and resources, project specifications and plans, terms, conditions, rates, client and vendor purchase details and characteristics, and specialized knowledge including information on sales, lead generation and business plans.

**Non-disclosure During Employment and After**
Employee further agrees that Employee shall not, without the express written consent of AFR, during the full term of employment and for the eighteen (18) month period commencing with the cessation of employment or other relationship with AFR disclose, reproduce, or make any use of the Confidential Information except on AFR's behalf and/or with AFR's knowledge written permission.  With respect to Confidential Information encompassed by this provision, such non-disclosure period shall continue for so long as such information remains confidential.

**Non-disturbance During Employment and After**
Employee agrees that Employee will not, during the entire term of employment or other relationship with AFR and for a period of eighteen (18) months following termination or cessation of employment or relationship, solicit or induce any person employed by or with an ongoing relationship with AFR to leave or terminate Employee's employment or relationship with AFR in order to obtain employment or a relationship with another firm or person.  With respect to Confidential Information encompassed by this provision, such non-disclosure shall continue for so long as such information remains confidential.

**Ownership of Business Materials and Employee Created Materials**
Employee agrees that all plans, lists, manuals, procedures, memoranda, computer data, brochures and other documents furnished by AFR or produced by Employee during the course of Employee's employment or other relationship shall remain and/or shall become the sole property of AFR and will be returned to AFR upon request and in any event, upon cessation of employment or other relationship.

**Miscellaneous** (forum selection clause)
This agreement shall be construed and enforced in accordance with the laws of the State of New Jersey (or federal law as applicable) in any proceeding brought to enforce same in any New Jersey Court, the Federal District Courts of New Jersey, or any other court notwithstanding any conflict of law provision that would purport to change the choice of law. The parties agree that the Federal District Court of New Jersey and the New Jersey Superior court shall have exclusive jurisdiction for any action relating to this Agreement or Employee's employment with AFR.

(Am. Compl. Ex. A.)

3

According to the certification of Richard Dubnoff, AFR's Chief Executive Officer, Laolagi and Lerhman tendered letters of resignation on February 28, 2014, effective two weeks from that date. (Dubnoff Cert. at ¶ 8.) Poche also resigned from AFR on February 28, 2014 effectively immediately. (*Id.*)

On March 5, 2014, Dubnoff claims to have become aware of a conversation Laolagi had with another AFR employee during which Laolagi suggested that he would be taking portions of one of AFR's client accounts (specifically, the Pinncale account) to his new employer. (Dubnoff Cert. at ¶ 10.) Consequently, Dubnoff became suspicious of wrongdoing and directed AFR's IT department to suspend Lehrman and Laolagi's access to AFR information and investigate these defendants' emails. (*See id.*) Additionally, on March 5, 2014, AFR accepted Lehrman and Laolagi' resignations effective immediately "as it seemed to AFR that was their preference." (*Id.* at ¶ 10.)

As a result of its investigation, AFR discovered that Lehrman had sent various emails from his AFR account to his personal email account containing what AFR claims is confidential information. Specifically, between November 2013 and February 2014, Lehrman sent himself emails containing the following: (1) a document entitled "Brokers.csv" containing a list which includes all of AFR's client brokers, primary points of contact for AFR's clients, the types of loans these client brokers are allowed to submit, and the broker clients' status with AFR; (2) a document entitled "Book1.csv" containing a list of the names, phone numbers and email addresses for thousands of AFR employees, vendors and account contacts; (3) a list of AFR's clients and their email addresses; and (4) AFR loan terms for manufactured housing loans. (Dubnoff Cert. at ¶¶ 11, 13-15; Baldini Supp. Cert., Ex. E.)

AFR also discovered that on November 25, 2013 (approximately three months before Laolagi's resignation), Defendant Mike Mirshahzadeh—one of Endeavor's principals—sent an email to Laolagi requesting certain documents, including production reports for the first, second, and third quarters of 2013 and the states in which certain loans originated. (Palmer Cert., Ex. M.) Additionally, it eventually came to light that on March 6, 2014, Endeavor sent an email with the subject line, "Jon Laolagi and Kurt Lehrman have moved," to Tyler McMahon of Alpine Mortgage Planning—one of AFR's manufactured housing clients whose account executive was Laolagi. (Am. Compl., Ex. I.) This email proposed terms for manufactured housing loans that were similar to, but slightly more advantageous than, the loan terms Lerhman sent himself on February 20, 2014.

According to AFR, all defendants "are utilizing AFR Confidential Information targeting AFR's clients and top account executives." (Pl. Br. at 9.) In his certification, Dubnoff asserts that "AFR goes to great lengths to protect [the information that AFR's former employees have allegedly misappropriated] including, but not limited to: (a) requiring all employees to sign a Non-competition/solicitation, Confidentiality and IP Assignment Agreement . . . (b) securing its entrances, requiring sign-in and identification of everyone entering the building; (c) securing its computer networks with the latest privacy and security technology; and (d) continually monitoring the foregoing to insure [sic] that the AFR Confidential Information remains secure, protected and out of the public domain." (Dubnoff Cert. at ¶ 5.)

B.    Procedural Background

On March 14, 2014, AFR filed an eight-count complaint asserting the following causes of action: (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; (3) misappropriation and conversion of trade secrets and confidential business information; (4)

common law unfair competition; (5) breach of the duty of loyalty; (6) tortious interference with contract; (7) tortious interference with prospective economic advantage; and (8) violation of the Racketeer Influenced and Corrupt Organizations Act.

Along with its complaint, AFR filed an application for an Order to Show Cause seeking temporary restraints. On March 17, 2014, this Court entered an Order granting Plaintiff's application and, in relevant part, temporarily restraining all defendants from:

1. Soliciting business from AFR's clients and/or vendors utilizing AFR's confidential information;

2. Soliciting or inducing any person employed by, or with an ongoing relationship with, AFR to leave or terminate his/her employment or relationship with AFR in order to obtain employment or a relationship with another entity or person; and

3. Disclosing, reproducing, or making any use of AFR's confidential information, including all proprietary and confidential information and trade secrets relating to AFR's clients, vendors and resources, project specifications and plans, terms, conditions, rates, client or vendor purchase details and characteristics, and specialized knowledge including information on sales, lead generation and business plans.

On April 5, 2014, AFR filed an amended complaint adding two additional defendants—Michelle Wilde and Anna-Cristina Dennin.[2] According to the amended complaint, Wilde and Dennin are former employees of AFR, and current employees of Endeavor. Like the other former AFR employees, Wilde and Dennin allegedly misappropriated AFR's confidential information and are using this information to help Endeavor obtain a competitive advantage over AFR in violation of the Agreement. AFR's amended complaint also added one additional claim—a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

---

[2] To date, no attorney has entered an appearance on behalf of Wilde and Dennin. AFR's counsel stated on the record that Wilde and Dennin "are not part of the Order to Show Cause application at this point." (Hearing Tr. 5:20-21.) Accordingly, the Court will not address the propriety of entering a preliminary injunction against these defendants at this time.

Defendants filed a response to AFR's Order to Show Cause on April 7, 2014, arguing that AFR is not entitled to a preliminary injunction because: (1) AFR does not satisfy the requisite legal standard for a preliminary injunction, (2) this Court lacks personal jurisdiction over Defendants, and (3) venue in this district is improper.

## III.   LEGAL STANDARDS

### A.   Personal Jurisdiction

"Under Federal Rule of Civil Procedure 4(k), a District Court typically exercises personal jurisdiction according to the law of the state where it sits." *O'Connor v. Sandy Lane*, 496 F.3d 312, 316 (3d Cir. 2007) (citing Fed. R. Civ. P. 4(k)).  Whether a federal court may exercise personal jurisdiction over a non-resident defendant will depend on: (a) whether the forum state's long-arm statute authorizes the exercise of personal jurisdiction, and (b) whether there are sufficient minimum contacts between the non-resident defendant and the forum state such that the exercise of personal jurisdiction would not offend due process under the Fourteenth Amendment. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009).

New Jersey's long-arm statute extends jurisdiction over non-resident defendants to the full extent permitted by the United States Constitution. *See Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 145 (3d Cir. 1992) (citing N.J. Ct. R. 4:4-4(c)).  Therefore, this Court need concern itself only with whether exercising personal jurisdiction over the non- resident defendants is constitutional.

"The two types of personal jurisdiction are general jurisdiction and specific jurisdiction." *O'Connor*, 496 F.3d at 317 (3d Cir. 2007).  General jurisdiction refers to a court's power to "hear any and all claims" against an out-of- state entity or person when its "affiliations with the

7

State are so continuous and systematic as to render [it] at home in the forum state." *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014) (internal quotation marks and citation omitted). Specific jurisdiction, by contrast, refers to a court's power to hear claims that specifically "arise[] out of a defendant's contacts with the forum." *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 (1984). The Third Circuit has held that in cases involving intentional torts, a plaintiff can establish personal jurisdiction upon satisfying the "effects test," which requires a showing that:

(1) The defendant committed an intentional tort;

(2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;

(3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of tortious activity.

*Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007); *see also Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (holding that personal jurisdiction over defendant accused of libeling plaintiff in publication was appropriate because defendant "knew [the publication] would have a potentially devastating impact upon respondent" and also "knew that the brunt of that injury would be felt by the respondent in the state in which she lives and works and in which the [publication] has its largest circulation.")

"Once challenged, the plaintiff bears the burden of establishing personal jurisdiction." *O'Connor*, 496 F.3d at 317. Plaintiff must prove that personal jurisdiction is proper "by affidavits or other competent evidence." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996). But if the district court does not hold an evidentiary hearing concerning the propriety of exercising personal jurisdiction, "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its

8

allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).

B. <u>Venue</u>

"The party arguing that venue is improper bears the burden of showing that venue does not lie." *Innovative Tech. Distribs., LLC v. Oracle Am., Inc.*, No. 11-1371, 2011 U.S. Dist. LEXIS 44930, at *9 (D.N.J. Apr. 25, 2011) (Linares, J.) (citing *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724-25 (3d Cir. 1982)). Under 28 U.S.C. § 1391(b), "A civil action may be brought in –

> (1) A judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) A judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) If there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."

When a contract that is the subject of a dispute contains a forum selection clause, said clause is "entitled to great weight" and is "presumptively valid." *Wall St. Aubrey Golf, LLC v. Aubrey*, 189 Fed. Appx. 82, 84 (3d Cir. 2006) (citing *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983)). Federal law governs the interpretation "of forum selection clauses because 'questions of venue and the enforcement of forum selection clauses are essentially procedural, rather than substantive, in nature.'" *Id.* (quoting *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir. 1995)).

C. <u>Preliminary Injunction</u>

"A preliminary injunction is an extraordinary remedy that should be granted only if: (1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the

plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." *Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citations omitted). The party seeking a preliminary injunction bears the burden of satisfying each of these factors. *See, e.g., Ecri v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).

## IV.   DISCUSSION

As questions of personal jurisdiction and venue are "threshold issue[s] that courts must address to determine whether litigation is being conducted in the right forum at the right time," the Court will address these issues before proceeding to consider the merits of AFR's application for a preliminary injunction. *See Small v. Camden County*, 728 F.3d 265, 269-70 (3d Cir. 2013).

### A.  Personal Jurisdiction and Venue

As an initial matter, Defendants have not met their burden of showing that venue in this District is improper. The crux of Defendants' argument is that because "there is no evidence that the location of the alleged acts took place in New Jersey," and because Endeavor is a California entity on whose behalf AFR's former employees allegedly acted, California is the more appropriate venue. (*See* Def. Oppn. Br. at 11-12.) While under 28 U.S.C. § 1391(a)(2), venue is proper where a "substantial part of the events or omissions giving rise to the claim occurred," Defendants do not set forth how the events or omissions giving rise to this litigation occurred in California.

More importantly, the Agreement that Laolagi, Lehrman, and Poche signed as a condition of their employment with AFR contains a forum selection clause providing that "the Federal District Court of New Jersey and the New Jersey Superior court shall have exclusive

10

jurisdiction for any action relating to this Agreement or Employee's employment with AFR," and that the Agreement "shall be construed and enforced in accordance with the laws of the State of New Jersey (or federal law as applicable)." (Am. Compl. Ex. A.)  In signing the Agreement, Laolagi, Lehrman, and Poche consented to resolving disputes arising from the Agreement in New Jersey, and also consented to being subject to personal jurisdiction in the courts of this state.  *See, e.g., Ingersoll-Rand Corp. v. Callison*, 844 F.2d 133, 134-35 (3d Cir. 1988) ("Personal jurisdiction over [the plaintiff] was obtained by means of the contractual forum selection clause."); *see also SKF USA, Inc. v. Okkerse*, No. 13-5111, 2014 U.S. Dist. LEXIS 5571, at *22-23 (E.D. Pa. Jan. 15, 2014) ("We have previously recognized that a defendant may consent to personal jurisdiction and venue through the execution of a valid forum selection clause.").

Defendants attack the validity of the forum selection clause in the Agreement by arguing that California law should govern the interpretation of the Agreement, and that an application of that state's law would compel this Court to conclude that the Agreement is unenforceable. (*See* Def. Resp. Br. at 13-16.)  Defendants' argument is misguided because it overlooks the well settled principle that federal, not state, law applies "when determining the effect of forum selection clauses because 'questions of venue and the enforcement of forum selection clauses are essentially procedural rather than substantive in nature.'" *E.g., Aubrey*, 189 Fed. Appx. at 84.  And under federal law, a forum selection clause such as that contained in the Agreement that each of AFR's former employees signed is "presumptively valid" and "entitled to great

weight."[3]   *Id.*   Accordingly, in light of the fact that Lehrman, Laolagi, and Poche signed Agreements providing for resolution of disputes in New Jersey under New Jersey law, the Court is satisfied that it has personal jurisdiction over these defendants and that venue in this district is proper.

At this juncture, however, AFR has not set forth a sufficient factual basis upon which this Court may satisfy itself that it has personal jurisdiction over Money Source, Endeavor, Darius and Michael Mirshahzadeh, and Papastavrou.[4]   AFR suggests that Money Source and Endeavor are subject to general personal jurisdiction in New Jersey because "they are actively doing business in this jurisdiction."  (Hearing Tr. at 7:12-14.)   But the U.S. Supreme Court recently rejected the notion that an out-of-state entity is subject to general personal jurisdiction in every state in which "it engages in a substantial, continuous, and systematic course of its business."  *See Bauman*, 134 S. Ct. at 761.  Furthermore, although AFR asserts that Darius and Michael Mirshahzadeh and Papastavrou have contacts with New Jersey, (*see, e.g.,* Hearing Tr. at 7-10), it has *specifically* articulated neither what those contacts are, nor why those contacts should subject these defendants to personal jurisdiction in New Jersey.

---

[3] Even if state law applied to the interpretation of the Agreement, the Court would still decline to hold that California law governs its interpretation.  A federal court sitting in diversity must apply the choice of law principles of the forum state.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).  In matters involving issues of breach of contract, "New Jersey abides by the 'most significant relationship test," which "focuses upon the state which has the most meaningful connection[] with the transaction between the parties."  *Bayside Chrysler Plymouth Jeep Eagle, Inc. v. Elizabeth MA & David MA*, No. A-3575-04T3, 2006 N.J. Super. Unpub. LEXIS 2924, at *9 (App. Div. May 26, 2006) (quoting *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 34 (1980)).  Of AFR's former employees, only Laolagi is a resident of California.  As California had no connection whatsoever to two out of the three Agreements at issue, the Court fails to see why California law should govern.

[4] It bears mentioning that the Court is not foreclosing the possibility that personal jurisdiction over these defendants may ultimately exist.  Rather, the Court is merely declining to decide the issue until the factual record is developed further.

As the factual record is insufficient to satisfy this Court that it has personal jurisdiction over Money Source, Endeavor, Michael and Darius Mirshahzadeh, and Papastavrou, it would be inappropriate to grant AFR's application for a preliminary injunction as to these defendants.

    B.   <u>Merits of AFR's Application for a Preliminary Injunction</u>

Having determined that, at this juncture, venue in this District is proper and that exercising personal jurisdiction over AFR's former employees is appropriate, the Court will now proceed to consider the propriety of granting AFR's application for a preliminary injunction as to Laolagi, Lehrman, and Poche.

    a.   <u>Likelihood of Success on the Merits</u>

Although AFR has asserted nine claims in its amended complaint, it has set forth arguments as to the likelihood of success on only two of them, namely, its claims for (1) breach of contract and (2) misappropriation and conversion of trade secrets and confidential information. As it is apparent that AFR has a reasonable likelihood of succeeding on its breach of contract claim, the Court will address this claim only.[5]

The elements of a breach of contract claim under New Jersey law are: "(1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages." *Sheet Metal Workers Int'l Assoc. Local Union No. 27 v. E.P. Donnelly,*

---

[5] At the April 14, 2014 hearing, AFR stated that it is not, at this juncture, arguing that it is likely to succeed on its breach of contract claim based on AFR's former employees' alleged violation of the non-competition provision in the Agreement. (*See* Hearing Tr. at 22:3-23:2.) Rather, AFR has restricted itself to arguing that it will likely succeed on its breach of contract claim because AFR's former employees have taken confidential information from AFR, and used it to lure AFR's clients in violation of the Agreement. (*See, e.g.*, Pl. Br. at 12; Hearing Tr. at 15-26; AFR Reply Br. at 4-10.) At this time, it is unnecessary for the Court to decide whether the Agreement is enforceable in its entirety, or whether there is a likelihood that AFR's former employees have breached the Agreement's non-competition provision. The Court will restrict its analysis to the same extent that AFR has restricted its argument. In other words, the Court will address AFR's likelihood of success on its breach of contract claim only insofar as AFR has argued that AFR's former employees have breached the Agreement by disclosing and making use of confidential information.

*Inc.*, 737 F.3d 879, 900 (3d Cir. 2013). The Court will now address the extent to which AFR is likely to satisfy each of the three elements of a breach of contract claim.

### 1.  Validity of the Agreement that each of AFR's Former Employees Signed

Under New Jersey law, a restrictive covenant, such as the Agreement, is enforceable if it is reasonable. *See Solari Industries, Inc. v. Malady*, 55 N.J. 571 (1970). A restrictive covenant "will generally be found to be reasonable where it [1] simply protects the legitimate interests of the employer, [2] imposes no undue hardship on the employee, and [3] is not injurious to the public." *Id.* at 576. Should a court determine that a restrictive covenant, or a portion thereof, is unreasonable, it may either disregard it or partially enforce it "to the extent reasonable under the circumstances." *Cmty. Hosp. Grp., Inc. v. More*, 183 N.J. 36, 57-58 (2005).

### i.    Whether the Agreement Protects AFR's Legitimate Interests

New Jersey Courts have recognized that an employer has a legitimate interest in protecting its confidential information.    *See Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 638 (1988) (noting that "employers may have legitimate interests in protecting information that is not a trade secret or proprietary information, but highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer."); *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 33 (1971) (observing that an "employer has a patently legitimate interest in protecting his trade secrets as well as his confidential business information and he has an equally legitimate interest in protecting his customer relationships.").

Defendants have not made any argument to the contrary. Rather, they maintain that AFR's allegedly confidential information is not legally protectable because it is in the public domain. (*See* Def. Oppn. Br. at 18-20.) That certain information may exist in the public domain,

14

however, does not categorically divest an employer from a protectable interest in that information. The New Jersey Supreme Court has made clear that "specific information provided to [employees] by their employer, in the course of employment, and for the sole purpose of servicing [the employer's] customers, is legally protectable as confidential and proprietary information." *Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 301 (2001). "In determining whether allegedly misappropriated information was provided in the course of employment for the sole purpose of furthering [an] employer's business interests, a court should consider the following: (1) the availability of the information to the general public; (2) whether the employee would have been aware of the information if not for the employment; (3) whether the information gave the employee a competitive advantage vis-à-vis the employer; and (4) whether the employee knew that the employer had an interest in protecting the information to preserve its own competitive advantage." *Metro. Foods, Inc. v. Kelsch*, No. 11-3306, 2012 WL 956178, at *6 (D.N.J. Feb. 14, 2012) (Linares, J.) (citing *Thomas & Betts Corp. v. Richards Mfg. Co.*, 342 Fed. Appx. 754, 759-60 (3d Cir. 2009)). Notably, "information need not rise to the level of a trade secret to be protected," and "may ***otherwise be publically available***." *Lamorte*, 167 N.J. at 301 (citations omitted) (emphasis added).

Notwithstanding the fact that the identities and points of contact of AFR's clients and the mortgage rates that AFR generally offers are available in the public domain, there has been no showing that *AFR's specific* points of contact, the *specific* rates that AFR offers to *specific*

clients, and *specific clients'* predispositions to certain products exist in the public domain.[6] It is this type of information that AFR alleges AFR's former employees are using to lure its clients by offering them more favorable terms. What is more, AFR's former employees knew that AFR had an interest in protecting this type of information by virtue of AFR's detailed efforts to safeguard this information, efforts which include requiring employees to sign the Agreement.[7] (*See, e.g.*, Dubnoff Cert. at ¶ 5.)

Accordingly, insofar as the Agreement precludes the disclosure and use of confidential information—a term that, within the context of this case, the Court construes to mean information that AFR communicates to its employees during the course of their employment which describes (a) the nature of AFR's relationship with specific clients, (b) the types of services AFR offers to specific clients, (c) the specific terms of service AFR offers specific clients, (d) AFR's specific business practices not readily obtainable in the public domain without some degree of effort, and (e) AFR's specific points of contact at specific clients, their specific contact information, and the AFR employee responsible for generating and/or maintaining a

---

[6] In its opposition brief, Defendants maintain that the information which AFR claims is confidential can be "replicated through public searches." (Def. Oppn. Br. at 19.) While this may be the case, the fact remains that *replicating* this information would entail a certain amount of effort. At issue in determining whether information is confidential is not whether it could be *replicated*, but whether it is readily ascertainable through public searches. *See, e.g., Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super 274, 295 (Law Div. 1995) (holding that confidential information was legally protectable where it was not "readily obtainable from trade directories and other publications."); *see also Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp. 2d 1079 (E.D. Cal. 2012) ("[W]here the party compiling the customer lists, while using public information as a source, . . . expends a great deal of time, effort, and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection.") (quoting *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F. Supp. 2d 1057, 1062-63, 1066 (D. Kan. 200])).

[7] Without citing any legal authority, Defendants maintain that AFR "foreswore action to protect its alleged confidential information" because AFR did not terminate Lehrman and Laolagi's access to information on February 28, 2014, the date they gave notice of their resignation. This argument lacks merit. As Defendants acknowledge, Lehrman and Laolagi's resignation was not effective on the date they gave notice. AFR, therefore, had no reason to terminate Lehrman and Laolagi's access to confidential information on February 28, 2014 because it expected these defendants to remain employed with AFR for an additional two weeks. Similarly, Defendants' argument that AFR failed to protect its confidential information because it did not require its former employees to sign the Agreement until after they were hired is directly contradicted by the record. (*See* Baldini Cert. Ex. D.)

relationship with these contacts—this Court holds that the Agreement protects a legitimate interest of AFR.

ii.   Whether the Agreement Either Imposes an Undue Hardship Upon AFR's Former Employees or is Injurious to the Public

In light of AFR's legitimate interest in preventing the use and disclosure of its confidential information, *see Whitmyer Bros.*, 58 N.J. at 33, the Court fails to see how the Agreement's provision precluding AFR's former employees from doing same either imposes an undue hardship or is injurious to the public. This is particularly so in light of Defendants' assertion that they "do not need any of the information AFR claims is 'confidential' or 'proprietary'" because they can rely on public sources to go about their business. (*See* Def. Oppn. Br. at 6.)

As the Agreement's provisions precluding the use and disclosure of AFR's confidential information protect AFR's legitimate interests, impose no undue hardship, and are not injurious to the public, this Court holds that these provisions are valid.

2.   Whether AFR's Former Employees have failed to Comply with the Agreement

As an initial matter, the factual record before the Court is devoid of any specific evidence suggesting that Poche has either used or disclosed AFR's confidential information in breach of the Agreement. Paragraph 36 of AFR's amended complaint contains a laundry list of specific allegations supporting AFR's contention that its former employees took confidential information in violation of the Agreement. (*See* Am. Compl. at ¶ 36.) Notably, AFR does not allege a single specific fact suggesting that Poche either took, disclosed, or made use of any confidential information. Accordingly, this Court has no basis upon which to conclude that AFR has a

17

reasonable likelihood of success on its breach of contract claim insofar as this claim is asserted against Poche.[8]

With respect to Lehrman and Laolagi, however, the Court is satisfied that AFR stands a reasonable likelihood of success on its breach of contract claim.  Before leaving AFR, Lehrman sent himself at least two emails containing information that falls within the scope of confidential information.  Specifically, on November 25, 2013, Lehrman sent himself the "Brokers.csv" document which, as discussed above, contains a list of AFR's client brokers, primary points of contact for AFR's clients, the types of loans these client brokers are allowed to submit, and the broker clients' status with AFR.  Lehrman also sent himself an email on February 20, 2014 containing AFR's specific terms for manufactured housing loans.  (Dubnoff Cert. at ¶ 15.)

The evidence in the record supports a reasonable finding that both Lehrman and Laolagi have used the confidential information they acquired while working at AFR to help Endeavor obtain a competitive advantage.  To provide just one illustrative example, on March 6, 2014, Endeavor sent an email with the subject line, "Jon Laolagi and Kurt Lehrman have moved" to Tyler McMahon of Alpine Mortgage Planning—one of AFR's manufactured housing clients whose account executive was Laolagi.  (Am. Compl., Ex. I.)  This email proposed terms for manufactured housing loans that were similar to, but slightly more advantageous than, the loan terms Lerhman sent himself on February 20, 2014.  (*Compare* Am. Compl., Ex. I, *with* Am.

---

[8] It bears mentioning that even if the Court were to consider AFR's likelihood of success on its misappropriation and conversion of trade secrets claim, AFR has not shown that it will likely succeed on this claim insofar as it is asserted against Poche because there is no specific evidence in the record that Poche did, in fact, misappropriate or disclose trade secret or confidential information.  *See Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 429-30 (3d Cir. 1982) (noting that disclosure of a trade secret is an essential element of a trade secret misappropriation claim).

Compl. Ex. G.)[9]  Based on this fact alone, AFR has a reasonable likelihood of convincing a jury

that Lehrman and Laolagi used their knowledge of AFR's loan terms for manufactured housing

loans to help Endeavor obtain a competitive advantage vis-à-vis Alpine Mortgage Planning in

breach of the Agreement.

Defendants suggest that neither Lehrman nor Laolagi can be in breach of the Agreement

because "AFR has not identified any client" that did not have a relationship with these

defendants preexisting their employment with AFR.  (*See* Def. Br. at 20-21.)  New Jersey courts

have observed that an employee cannot generally be enjoined from soliciting business from

contacts the employee developed before working for a particular employer.  *See, e.g., Coskey's*

*Television & Radio Sales & Service, Inc. v. Foti*, 253 N.J. Super. 626, 636-37 (App. Div. 1992)

(noting that it would be "neither a fair nor viable alternative" to require an employee to give up

"the contacts that he had personally developed" in the communications industry prior to working

for plaintiff employer because "[w]hat [an employee] brought to his employer, he should be able

to take away.").  The critical issue here, however, is not Lehrman and Laolagi's mere possible

exploitation of relationships they developed before working at AFR.  As the example discussed

above demonstrates, the evidence in the record suggests that Lehrman and Laolagi are using

information about AFR's loan terms and AFR's clients' predisposition to purchase products and

services AFR offers to help Endeavor obtain a competitive advantage.  In light of this, AFR has a

reasonable likelihood of demonstrating that Lehrman and Laolagi have failed to comply with the

Agreement.

---

[9] For example, the following terms that Lehrman sent to himself on February 20, 2014, and those that Endeavor proposed to McMahon are identical: (1) maximum loan-to-value rations of 96.5% on purchases, (2) maximum loan-to-value ratios of 85% on cash-out refinances, and maximum loan-to-value ratios of 97.75% on rate/term refinances. Nevertheless, whereas AFR requires a minimum FICO score of 620 for these loan-to-value ratios to apply, Endeavor's proposed terms to McMahon require only a minimum FICO score  of 580. (Am. Compl., Exs. G, I.)

19

3.   Causal Relationship Between Lehrman and Laolagi's Breach and AFR's Damages

As discussed further in Section IV.B.b., *infra*, AFR has made a sufficient showing of damages flowing from Lehrman and Laolagi's breach of the Agreement. Specifically, the use of AFR's confidential information to lure clients away from AFR not only results in the loss of business and clients, but erodes AFR's relationship with its clients and damages its reputation in the mortgage industry.

For the foregoing reasons, the Court finds that AFR has made a showing of a likelihood of success on its breach of contract claim insofar as this claim is asserted against Lehrman and Laolagi. As for Poche, however, AFR has failed to show a likelihood of success on its breach of contract claim because it has not set forth any *specific* evidence suggesting that Poche took, disclosed, or used AFR's confidential information.

b.   Irreparable Harm[10]

Having determined that AFR has established a reasonable likelihood of success on the merits of its breach of contract claim insofar as this claim is asserted against Lehrman and Laolagi, the Court now turns to consider the remaining three prerequisites for imposition of a preliminary injunction: (1) the existence of irreparable harm, (2) the balance of the hardships, and (3) the public interest.

To establish a showing of irreparable harm, AFR must demonstrate more than a mere risk of injury; it must make "a clear showing of immediate irreparable injury." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 205 (3d Cir. 1990). It is well settled that "[t]he availability of adequate monetary damages belies a claim of irreparable injury. . . . [because] a purely economic

---

[10] The Court notes that the Agreement's provision stating that a breach of the Agreement will irreparably harm AFR has not factored into the Court's analysis as to whether AFR has satisfied the irreparable harm prong of the preliminary injunction analysis.

injury, compensable in money, cannot satisfy the irreparable injury requirement." *Frank's GMC Trust Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988).

Here, the Court is satisfied that AFR faces an immediate threat of irreparable harm should an injunction not issue. Lehrman and Laolagi's continued use of AFR's confidential information in breach of the Agreement risks further eroding the goodwill of AFR's clients and AFR's reputation in the mortgage industry. Such injuries are, precisely, of the type that preliminary injunctions are designed to redress. *See, e.g., Fisher Bioservices, Inc. v. Bilcare, Inc.*, No. 06-567, 2006 U.S. Dist. LEXIS 34841 at *63 (E.D. Pa. May 31, 2006) ("Within the Third Circuit, courts have found that injury to goodwill and the use of a company's confidential information are the types of injuries which would constitute irreparable harm that cannot be compensated with money damages.") (citing cases); *Jackson Hewitt, Inc. v. Barnes*, No. 10-5108, 2011 U.S. Dist. LEXIS 4823, at *11 (D.N.J. Jan. 18, 2011) ("Where a party is in possession of another party's confidential information and is poised to use or disclose such information, either personally or through an agent such as a parent or close associate, there is a likelihood of irreparable harm.").

Defendants advance two key arguments in support of their position that AFR cannot satisfy the irreparable prong of the preliminary injunction analysis, neither of which this Court finds persuasive.

First, Defendants suggest that "there exists no imminent threat of disclosure as to AFR's confidential information since it has been disclosed according to AFR," and has been

destroyed.[11]  (Def. Oppn. Br. at 26.)  The Court is mindful that the Third Circuit has held that

"once a secret is revealed, there is nothing for an injunction to protect."  *ACE Am. Ins. Co. v.*

*Wachovia Ins. Agency Inc.*, 306 Fed. Appx. 727, 732 (3d Cir. 2009) (citing *Campbell Soup Co. v.*

*ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992)).  But here, the issue is not merely disclosure of

AFR's confidential information, but its *continued* *use* to solicit other clients of AFR.

     Second, relying on *ACE*, Defendants argue that "[l]ost sales and injury to reputation and

good will are subcategories of lost profits and do not constitute irreparable injury."  (Def. Oppn.

Br. at 27.)  Defendants' reliance on *ACE* is misplaced.  In *ACE*, the Third Circuit held that a

denial of the plaintiff's application to preliminarily enjoin the defendant from selling certain of

its assets during the pendency of an arbitration based on breaches of an agency agreement did not

amount to irreparable harm because any resulting loss in the plaintiff's "business, market share

or goodwill should be reducible to a monetary figure."  306 Fed. Appx. at 731.  The *ACE* court

did not specifically address whether loss of reputation and goodwill stemming from the use of

confidential business information in breach of a contract amounted to irreparable harm.

     While the Court acknowledges that a plaintiff's "blanket statement" that failure to issue a

preliminary injunction will cause irreparable harm to reputation and good will is insufficient, *see,*

*e.g., Stryker v. Hi-Temp Specialty Metals, Inc.*, No. 11-6384, 2012 U.S. Dist. LEXIS 28414, at

*17 (D.N.J. Mar. 2, 2012), the Court is satisfied that AFR has set forth sufficient evidence that

Lehrman and Laolagi's targeting of AFR's clients using AFR's confidential information will

damage AFR's reputation within the industry, and erode its goodwill among its clients.

---

[11] In their opposition brief, Defendants argue that the destruction of AFR's documents containing confidential information demonstrates that there has been no breach of the Agreement.  (*See* Def. Oppn. Br. at 24.)  The Court does not see how the destruction of these documents shows that there has been no breach, as the possibility remains that AFR's former employees could use confidential information that they learned exclusively from these documents in breach of the Agreement.  Nevertheless, the Court will consider the extent to which the destruction of these documents undermines AFR's argument that it will suffer irreparable harm absent a preliminary injunction.

      c.      <u>Irreparable Harm to Lehrman and Laolagi</u>

Defendants argue that a preliminary injunction would cause irreparable harm to them because it "would dramatically impair Laolagi [and] Lehrman['s] . . . ability to earn commissions that is [sic] used to provide for themselves and their families." (*See* Def. Oppn. Br. at 29.) This argument lacks merit. AFR does not seek to preliminarily enjoin any of the defendants from competing in the mortgage industry. In fact, AFR has consistently acknowledged that any preliminary injunction this Court enters would not preclude any defendant from "call[ing] on brokers and real estate agents and offer[ing] [them] deals." (*See* Pl. Br. at 19.) As a preliminary injunction would not prevent Laolagi and Lehrman from continuing to earn a living in the mortgage industry, the Court fails to see how these defendants would suffer any irreparable harm.

      d.      <u>The Public Interest</u>

"As a practical matter, if a [party] demonstrates both a likelihood of success and irreparable injury, it almost always will be the case that the public interest will favor [that party]." *AT&T v. Winback & Conserve Prog.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). Defendants argue that a preliminary injunction would violate the public interest because it "would deprive the public of the ability to secure the most competitive mortgage rates under the best terms by limiting market participants in violation of 12 C.F.R. § 226.36(e)(3)(i)."[12] (Def. Oppn. Br. at 30.) This argument is unpersuasive because nothing in 12 C.F.R. § 226.36(e)(3)(i) gives mortgage account executives a license to use a former employer's confidential information in violation of an employment contract to obtain a competitive advantage.

---

[12] In relevant part, 12 C.F.R. § 226.36(e)(3)(i) requires loan originators to "obtain loan options from a significant number of creditors with which the originator regularly does business."

As this Court has previously noted, "the public has an interest in upholding freely negotiated and reasonable contracts between employers and employees." *W.R. Huff Assest Mgmt. Co., LLC v. Harmonay*, No. 06-5101 (Linares, J.), Docket Entry No. 28, *aff'd* 235 Fed. Appx. 41 (3d Cir. 2007); *see also Ciavatta*, 110 N.J. at 639 ("We reiterate that the public has a clear interest in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and technique in which the employer may be said to have a proprietary interest."). Accordingly, the public interest is best served by holding Lehrman and Laolagi to the terms of the Agreement.

## V.    CONCLUSION

For the foregoing reasons, AFR's application for a preliminary injunction is granted in part and denied part. Specifically, AFR's application is granted as to Lehrman and Laolagi. These defendants are preliminarily enjoined from using any of the following information AFR communicated to them during the course of their employment at AFR to solicit AFR's clients and employees: (1) the nature of AFR's relationship with its specific clients; (2) the types of services AFR offers to specific clients; (3) the predisposition of AFR's clients for certain types of products and services offered by AFR; (4) the specific terms of service AFR offers to specific clients; and (5) AFR's specific points of contact at specific clients and the specific AFR employees responsible for generating and/or maintaining relationships with these contacts. AFR's application for a preliminary injunction is denied as to Money Source, Endeavor, Poche, Michael and Darius Mirshahzadeh, and Papastavrou.

An appropriate Order follows.

24

Dated: April 28, 2014

_____
Jose L. Linares
United States District Judge